UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 24-CR-20398-RUIZ/LOUIS

UNITED STATES OF AMERICA

v.

FEDERICO NANNINI
MAURO NANNINI

_____/

**MAURO AND FEDERICO NANNINI'S SENTENCING MEMORANDUM
IN SUPPORT OF A VARIANCE AT SENTENCING**

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

*/s/ Howard Srebnick*
**HOWARD SREBNICK**
Florida Bar No. 919063
HSrebnick@RoyBlack.com

*/s/ Jackie Perczek*
**JACKIE PERCZEK**
Florida Bar No. 042201
JPerczek@RoyBlack.com

*/s/ Jeanelle Gomez*
**JEANELLE GOMEZ**
Florida Bar No. 1026021
JGomez@RoyBlack.com

**BlackSrebnick**

CIVIL | CRIMINAL

# **TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................... 4

II. LEGAL STANDARD ............................................................................ 6

   A. The history and characteristics of the defendants ......................................... 7

     *1. Three generations of Nanninis* ............................................................. 7

     *2. The kidnapping of Mauro and Claudine Nannini* ............................... 8

     *3. Starting over in the United States* ........................................................ 10

     *4. A family built on love and commitment* ............................................... 11

     *5. Mauro's goodwill* ................................................................................. 13

     *6. Mauro's prostate cancer and his mental health after the arrest* .......... 18

     *7. Federico's challenges growing up* ....................................................... 21

     *8. Federico continues his father's commitment to goodwill* .................... 25

   B. The nature and circumstances of the offense ................................................ 27

   C. The purpose of sentencing ............................................................................ 32

   MAURO NANNINI

     *1. Mauro accepted responsibility for his actions promptly* .................... 33

     *2. Mauro's conduct was an isolated event that does not reflect
       the core of his character* ...................................................................... 34

     *3. Mauro's cancer diagnosis and no risk of recidivism support a
       sentence of home confinement* .............................................................. 37

**BlackSrebnick**

CIVIL | CRIMINAL

FEDERICO NANNINI

1. *Federico accepted responsibility for his actions promptly*...................41

2. *The advisory guideline range does not compute a fair penalty for Federico* .....................................................................44

3. *Federico has suffered a devastating price for his wrongdoing* ...........48

D. The need to avoid unwarranted sentencing disparities supports a downward variance for Mauro and Federico .................................................50

1. Insider trading cases where courts imposed non-custodial sentences......50

2. Insider trading cases where courts granted a significant downward variance ...................................................................53

E. The potential financial penalties that Mauro and Federico face ...................55

III. CONCLUSION.................................................................57



www.royblack.com | 201 S. Biscayne Boulevard Suite 1300 Miami, FL 33131 | *p* 305.371.6421

## I. INTRODUCTION

Mauro and Federico Nannini were arrested on September 13, 2024. Within a week of their arrest, undersigned counsel initiated discussions with the government to explore a guilty plea and early disposition of the case. The Nanninis pled guilty in December 2024, with Mauro agreeing to a $180,328.41 forfeiture. To demonstrate that he intended to comply with the terms of the agreement and fulfill his financial obligations to the government, Mauro transferred the full forfeiture amount to undersigned counsel's trust account a few days after his guilty plea, where the funds have remained available for payment to the government upon sentencing.

Mauro (father) and Federico (son) are now before the Court to face the consequences of their actions. They are remorseful and ashamed for the crime they committed and the pain they have caused their family and friends. Mauro recognizes that he made a grave mistake, and the realization that he failed as a father when he had the opportunity to guide Federico away from this offense is agonizing. And Federico feels profound pain and regret that his actions contributed to his father and his best friend Thermiotis being indicted, and to his former employer becoming embroiled in an insider trading investigation. Federico lost everything he worked so hard to attain, including his job at BRG that he was immensely grateful for and the mentorship of his supervisor there, someone Federico admired.



www.royblack.com | 201 S. Biscayne Boulevard Suite 1300 Miami, FL 33131 | p 305.371.6421

Many individuals who know the Nanninis have written urging the Court to impose a sentence involving no incarceration. Such a sentence will hold the Nanninis accountable for their actions in light of all the purposes of sentencing. Mauro is 63 years old and under active surveillance for prostate cancer. His gain from this offense was at most $180,000, which Mauro has agreed to disgorge. His advisory guideline range is either 8-14 or 12-18 months, depending on how the Court rules on his objection to the gain calculation in the PSI report. Mauro is a first-time offender who poses no risk of reoffending and whose conduct was an aberration from his otherwise law-abiding and philanthropic life. Mauro has been a thoughtful and present father and husband, and has had an impactful and positive influence in the lives of his family and friends and of so many who are living in poverty. The letters from Mauro's friends and family show that Mauro has prioritized generosity and service to others, and that his philanthropy is woven into the person he is. A sentence of home confinement would be consistent with similar sentences imposed throughout the country as detailed in this memorandum.

Federico made zero dollars from this offense. He never traded on the stock and made $0 gains. His guideline is being driven entirely by the gains of his father and the substantial gains of Thermiotis, which Federico did not direct and in which he did not share. In this memorandum, Federico shares with the Court his difficult years growing up to help explain his actions in proviidng the confidential



information to two of the most important people in his life—his father and his best friend. Federico was not motivated by malice or a desire to cause harm, but instead because he yearned for validation and belonging.

Mauro and Federico submit this memorandum to seek the Court's mercy and leniency at sentencing. As more fully described below, the § 3553(a) factors support a non-custodial sentence with a substantial period of public service. As one of the Nannini family friends states in his letter, "I understand that we all, at times, make mistakes. Life is complex, and even the best among us can falter. But what defines a person is not their mistakes but their willingness to learn, to grow, and to continue to contribute to the world around them." (Exh. 1 Letter of Eduardo Pines). The Nanninis have learned that lesson.

## II. LEGAL STANDARD

The Court is familiar with the legal standards that apply to sentencing: The Sentencing Guidelines are only an initial benchmark, to be considered in conjunction with multiple other factors in fashioning an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). To treat the Guidelines as mandatory or even as presumptively reasonable is error. *Rita v. United* States, 551 U.S. 338, 351 (2007).

In reaching an individualized sentencing decision, the Supreme Court's overarching instruction is that the Court "impose a sentence sufficient, but not greater than necessary," to accomplish the goals of sentencing set forth in 18 U.S.C.



§ 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The Court considers every person as an individual, and every case as unique. *Gall*, 552 U.S. at 53.

### A. The history and characteristics of Mauro and Federico Nannini

1. <u>Three generations of Nanninis</u>

Mauro's father, Federico's grandfather, was born into a very poor family in Florence, Italy, during the hardships following World War II. At the age of 30, Mauro's father was given the opportunity to migrate to Venezuela and start over. With little to his name, Mauro's father began working at a bank in Venezuela, rising through the ranks until he had the opportunity to branch out on his own. He became an entrepreneur, first establishing a heavy tooling machinery company and later expanding into various industries, including automotive manufacturing and hardware retail. Mauro's father is 95 years old and has written a letter to the Court in anticipation of sentencing.

Mauro, who is 63 years old, was born in Valencia, Venezuela, in 1961, and moved to the US in 1994 and was naturalized as a U.S. citizen in 2004. Mauro attended Catholic school and grew up witnessing his father's hard work and determination, which instilled in Mauro a strong work ethic and foundation for success. Mauro attended the Universidad Metropolitana in Caracas, earning a degree in civil engineering in 1982.



Mauro's dream was to start his career in construction, but a severe economic downturn in Venezuela brought the construction industry to a standstill soon after Mauro graduated college in 1982. Mauro sought employment in the financial sector and became a stockbroker in the Caracas Stock Exchange.

While working as a stockbroker, Mauro met his now-wife Claudine; he was 27 years old, she was 20. Reflecting back, Claudine remembers that "[w]hat … stood out to me was his devotion to his family. Mauro's example of being a loving son tending to his parents every single day of his life since I met him, being a loyal brother, a reliable friend, and a man of integrity made me realize he would be an exceptional husband and father—and I was right." [1]

Before Mauro and Claudine embarked on their journey to the United States, they faced a devastating tragedy in Venezuela.

2. <u>The kidnapping of Mauro and Claudine Nannini</u>



---

[1] The letters in support of Mauro are attached as Exhibi 1 and the letters in support of Federico are attached as Exhibit 2.





███████████████████████████████████

████████████████████

### 3. Starting over in the United States

Mauro and Claudine arrived in Miami in 1994 and stayed at Claudine's father's apartment while they worked to rebuild their lives. Mauro pursued several business ventures, and eventually settled on real estate development. With the help of his father and father-in-law, Mauro founded 4N Development Company, LLC, a construction company specializing in single-family homes in Coral Gables, Coconut Grove, and South Miami. From 2000 to 2018, Mauro built a successful development company through the same work ethic and care for his employees that Mauro had learned from his father. Guillermo de la Paz, Mauro's longtime friend and business partner, describes Mauro as an empathetic and hands-on employer:

> Mauro led by example, making it a point to show up to work daily, eating breakfast with the laborers in the morning and working late into the night. While other subcontractors were getting robbed of their labor and not getting paid, Mauro stepped up to continue and provide job opportunities. He wasn't the kind of developer that never visited the jobsite, nor the kind that thought he was above others. Mauro's empathy and ability to think outside himself has always been his character, it's how we will remember him.

(Exh. 1 G. de la Paz). Samantha Rivero, who has known Mauro since childhood, witnessed Mauro's work ethic firsthand when she purchased a home that Mauro was building:



> During the construction, I visited the site daily after dropping my children off at school, and Mauro was always present - either overseeing the workers or ensuring everything was progressing smoothly. He treated everyone with the utmost respect, and his genuine care for the project was evident in every detail of the home.

(Exh. 1 S. Rivero) Mauro's dedication and hard work were the driving forces behind his construction firm's success. And Mauro carried these same principles into raising his family.

### 4. A family built on love and commitment

After arriving in Miami, Mauro and Claudine started a family and now have three children—Mauro (29), Isabella (28), and Federico (26). Coming from a family background of emotional abuse, Claudine initially feared raising a family of her own. She doubted whether she could build a healthy, loving family, but "Mauro changed that for" her. (Exh. 1, C. Nannini). "He taught me that family isn't about where you come from but about the values, love, and commitment you create together. His kindness, patience, and dedication gave me the strength to break the cycle of dysfunction and give our children a stable, loving home." *Id.*

Isabella's godmother, who has known Mauro for over 40 years, describes the Nannini family as inseparable and admires their deep bond and devotion to one another: "Their children, Mauro, Isabella and Federico have been raised with beautiful family values, educated with integrity, respect, love and gratitude. They are an inseparable family, united by love, endless support, and a deep commitment

to always caring for one another." (Exh. 1 C. Delano). Isabella says that Mauro "is

not just a great father—he is the best person I know." (Exh. 1, I. Nannini).

Federico has followed in his father's footsteps, continuing the traditions and

values that define their family:

> Fede is a family man in every sense of the word. He has always been
> devoted to his parents and, above all, his only sister, Isa. It is truly
> heartwarming to see the love and patience he has for her—He treats her
> like a princess, and that is just a small reflection of the kind of man he
> is.

(Exh. 2 C. Osio). Federico's sister, Isabella, describes Federico as "a deeply caring

and compassionate person. He has always been there for me, constantly checking in

and offering support, whether it's for big life events or simply to make sure I'm

okay." (Exh. 2 I. Nannini).  Federico's mom talks about how attentive he is to the

family and devoted to her: "Through it all, Federico has been an incredibly special

son to me. He is deeply caring and attentive, knowing what suffering feels like,

always worrying about me—whether it's work, family, or my emotional well-

being."(Exh. 2 C. Nannini).

Isabella is pregnant (due in May) and Federico eagerly awaits to become an

uncle, and Mauro a grandfather, for the very first time. "The news of his first

grandchild arriving in May 2025 brought him [Mauro] to tears." (Exh. 1 C. Delano).

This is a photograph of the Nannini Family:





Above all, Mauro and Claudine have raised their children with a heart toward giving, making it a family tradition to regularly give to those in need. In her letter to this Court, Isabella wrote about the values her dad instilled in her and her brothers: "My father's character is defined by his service and compassion, and through his example, he has passed down the values of kindness and giving to our family." (Exh. 1 I. Nannini).

5. Mauro's goodwill

Mauro has had a giving heart since he was young. Back in Venezuela, when he was 12 years old, Mauro started volunteering with Fe y Alegria at the Colegio

San Ignacio de Loyola.[2] Fe y Alegria is a global movement focused on providing quality education, social development, and opportunities to the poorest sectors of society. (www.feyalegria.org/la-educacion-popular-es-nuestro-camino/). Mauro's childhood friend, Oscar Eduardo Sabater, remembers how together they would "sell[] tickets for fund raising events or donat[e] used clothes to those in need. We also contributed food to school cafeterias serving underprivileged children and spent time at their schools, engaging in sports activities such as soccer and baseball." (Exh. 1 O. Sabater). "Mauro was always the one encouraging us to be more active in these social groups," Alejandro recalls. (Exh. 1 A. Rodriguez).

When Mauro moved to the U.S., he continued his legacy of community service. For over a decade, Mauro has been involved with Fundacion Techo, which provides comprehensive care to people living in extreme poverty in Latin America. (Exh. 1 Fundacion Techo letter by M. Gomez). Morella Gomez, the general director of Fundacion Techo, describes in her letter Mauro's contributions over the years:

> I have had Mauro's unconditional support in fundraising activities, as well as his constant concern and willingness to assist with the various Foundation programs. Despite not living in Venezuela, Mauro has always shown sensitivity toward the most disadvantaged, consistently seeking ways to help through NGOs such as Fundacion Techo. Since more than 10 years ago, Mauro has been one of the main contributors of The Basic Care Program, donating gently used clothing, as well as non-perishable food, personal hygiene supplies, and first aid items.

---

[2] Exhibit 1, letter of Juan Domingo Perez (recounting how Mauro and him began volunteering with Fe y Alegria at just 12 years old).



*Id.*

For the last decade, Mauro has also been deeply involved with Parroquia Nuestra Señora de la Candelaria. "His regular contributions help provide meals to the most vulnerable members of our community, mainly elderly individuals and unemployed persons who rely on the parish for weekly food aid." (Exh. 1 Parroquia Nuestra Señora de la Candelaria letter). Mauro's efforts were especially helpful during the pandemic, when "churches were forced to close their doors" and their "income dropped to zero":

> Mr. Nannini took it upon himself to send enough food supplies, meat, flour, eggs, to sustain the parish for an entire month. Thanks to his generosity, we were able to provide for the priests and staff members who depended on the parish for their daily meals. His assistance during the pandemic was a crucial lifeline, ensuring not only the parish's survival but also that employees retained their jobs.

*Id.*

Mauro has also donated money to churches in Miami, such as the Saint Theresa Parrish Church of the Little Flower (from 2000 to 2006), and churches in Latin American countries like the San Pedro Masahuat, in La Paz, El Salvador. Mauro's "unwavering commitment—through generous financial donations, clothing, shoes, and food, as well as [his] heartfelt dedication to helping those most in need within our community—has made a significant difference in the lives of countless individuals." (Exh. 1 San Pedro Masahuat, La Paz, El Salvador).

Mauro raised Federico and his two other children to have a practice toward giving, teaching them to hold onto only what is essential so they can give to those in need. Mauro's daughter explains in her letter:

> Beyond his volunteer work, he has instilled in me and my siblings the importance of generosity and living without excess. For example, during Christmas, we collect toys to donate to orphans. Additionally, since childhood, we have regularly donated clothing and other items to those in need, and whenever natural disasters have affected our community, our family has always found ways to contribute.

(Exh. 1 I. Nannini). Mauro and his wife Claudine also participate in a program called Children International, where they sponsor children in need in Colombia, the Dominican Republic, and other countries. Mauro and Claudine have been involved with Children International since 1996. As part of the program, Mauro and Claudine are assigned to specific children who they support by sending care packages with essential items and providing financial support to ensure the children have access to education, which would otherwise be out of reach. (Exh. 1 C. Nannini).

The Nanninis and their sponsored children exchange letters of support and the children often send updates on their education and activities. One of their sponsored children from throughout the years, Pamela Rodriguez Placido, wrote to them (before Mauro was arrested) saying how much she appreciates Mauro and Claudine's support: "I thank you for everything you have done for me. I thank you for all the gifts you have provided for me. I hope you are doing well . . . I have many



friends and I share lots with them during the recreation time in school. I like the school. May God bless you." (Exh. 1 P. Rodriguez Placido).

Mauro is currently a volunteer with Orden de Malta in Miami, a humanitarian organization that provides medical aid, disaster relief, and support for the poor and sick worldwide. This volunteer work started two years ago (before Mauro was arrested). Once a week, Mauro helps assemble care packages, gather groceries, cook and serve food, and create a welcoming space where the poor and elderly can share a meal together.

Mauro's goodwill extends to anyone he knows is in need. His wife Claudine remembers the time when their gardener, while doing work on someone else's yard, was tragically struck by lightning and passed away: "The news devastated us all, but Mauro's immediate reaction left a profound impact on me. Without hesitation, he went to the funeral home and paid for all the funeral and burial expenses. He did so quietly and without seeking recognition, purely out of compassion for the gardener's grieving family. His kindness eased the unbearable burden of unexpected costs during such a heartbreaking time. It was an act of selflessness that surprised the gardener's family and brought them some measure of comfort during their sorrow." (Exh. 1 C. Nannini).



6. <u>Mauro's prostate cancer and his mental health after the arrest</u>

In 2023, a prostate biopsy tested positive for a malignant neoplasm, and a second opinion later that year confirmed a prostate cancer diagnosis for Mauro.[3] As a consequence of this diagnosis, Mauro is under active surveillance, requiring lab tests and studies every three months to monitor the progression of his condition. The medical regimen includes ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Prostate cancer can be treated with a high degree of success but only if testing is performed on a regular and timely basis as Mauro does now, so that if medical intervention is needed—for example radiation or full prostate removal—these treatments are undertaken immediately so that the cancer does not spread outside the

---

[3] Exhibit 3 at 3, 12 (M. Nannini's medical records, to be filed under seal).

prostate.[4] Currently Mauro takes at least 10 medications daily to treat ███████

██████████████████████████████████████████████████████

████████████████████

The pain and suffering that Mauro has experienced since his arrest has also impacted his health. His daughter Isabella shares with the Court: "I am deeply concerned about my father's health. He has been battling cancer and suffers from other serious conditions, including high blood pressure and high cholesterol. The immense stress of this situation has taken a heavy toll on him, both physically and emotionally. I fear that further hardship could worsen his condition." (Exh. 1 I. Nannini). Mauro's wife also writes about how much Mauro's actions have weighed on him and his health:

> The impact that the shame and remorse have had on him have affected
> almost every aspect of Mauro's life. He cannot sleep. He cannot eat. He

---

[4] "Your outlook is excellent if your healthcare provider detects prostate cancer early. Almost everyone—99%—diagnosed with cancer that hasn't spread outside of their prostate live at least five years after diagnosis. Is prostate cancer very curable? Yes, if it's caught early. Prostate cancer survival rates aren't as good when the cancer's metastasized, or spread outside of your prostate." https://my.clevelandclinic.org/health/diseases/8634-prostate-cancer.



cannot concentrate. His thoughts are scattered, and he struggles to find his words—something so uncharacteristic of him. He has sought treatment with a psychiatrist to help him heal. I see the toll this has taken on him emotionally, and I know that as a father, he carries an even heavier burden.

(Exh. 1 C. Nannini).

Mauro has also suffered tremendously as a result of the shame, fear, and remorse he feels for the crime he committed.  Mauro carries a deep sense of guilt for his actions.

His daughter describes how difficult it is to see Mauro in this condition:

> [T]he weight of this situation has deeply affected him. He is no longer the happy, carefree person he once was. The stress and remorse he feels have caused a significant shift in his personality, and it is painful for me to see the man I've always known struggle so much. The burden of this mistake has weighed on him emotionally, and it's evident that this has taken a toll on his overall well-being.

(Exh. 1 I. Nannini). His friend John Keeler describes in his letter how Mauro "shamedly admitting his wrongdoing and pleading guilty was a natural on him," and that "the consequences to his emotion and physical health are negatively unsurmountable" as Mauro is "living every day with the overwhelm sense of remorse, that his action violated the law and affected others, which his selflessness nature is to make a significant impact on his loved one, the community, and fostering kindness generously." (Exh. 1 J. Keeler).



It is with this deep remorse that Mauro stands before the Court for sentencing.

7. <u>Federico's challenges growing up</u>

Federico was born in Miami in 1998, the youngest of Mauro and Claudine's three children. Claudine remembers that Federico "came into our lives under difficult circumstances." (Exh. 2 C. Nannini). Claudine was working full time at AXA Advisors while also raising Mauro and Isabella, who were just one and two years old. "When Federico was born, we faced an unexpected reality: he was diagnosed with an extremely rare condition called hypertrichosis lanuginose, in which his body and face were completely covered in black hair, from his head to his feet." Claudine did everything she could to help Federico:

> I took him to endocrinologists, specialized pediatricians, dermatologists, neurologists, psychologists, and other specialists. I also subjected him to painful treatments at a very young age, such as laser and constant shaving, hoping to offer him an alternative so he wouldn't have to live with this condition his entire life. My goal was always to protect him and give him a chance to live without the stigma his appearance imposed on him.

(Exh. 2 C. Nannini). But still, Federico endured constant bullying growing up, as his mom states: "[D]espite my efforts, Federico faced constant bullying from the moment he started school." (Exh. 2 C. Nannini). Claudine "had to intervene many times, speaking with teachers, coaches, tutors, and even the mothers of other children to try to shield him." *Id.*



Federico's friends remember the difficulties Federico had to overcome, facing "relentless bullying at school for his hairy arms." (Exh. 2 B. Dierickx). "Kids cruelly nicknamed him 'Chewbacca,' and 'monkey' although he laughed it off publicly, I saw how much it wounded him." *Id*. Claudine recalls how Federico tried to conceal his pain to spare her from worry: "Even though I knew it deeply hurt him, he would often hide his pain to protect me from seeing him suffer." (Exh. 2 C. Nannini).

Federico tried to respond to the bullying with empathy and resilience, but in reality he was broken inside. As the Court knows, the damage that bullying can cause a young person can be quite severe and long-lasting, leading to depression and anxiety, low self-esteem and low self-worth, and struggles with personal relationships, whether socially or later in life at work. Federico's close childhood friend, Brandon, recalls a time when Federico's older brother tried to intervene and defend Federico from the bullying: "Federico's response stayed with me: 'People act mean when they're hurting inside.'" (Exh. 2 B. Dierickx).

By high school, Federico was shaving his body to try to hide the condition that made him most vulnerable to bullying, and he was eventually able to have successful laser hair removal treatments. Yet, Federico tried not to let bitterness take root. Instead, he tried to turn his struggles into a source of encouragement for others, including by volunteering with organizations that helped kids with educational or developmental disabilities. Federico's friend Brandon remembers the time that

**BlackSrebnick**
CIVIL | CRIMINAL

Federico reassured another friend who was mocked for acne: "Don't let words make you hate yourself." *Id.*

Matias Gonzales, a longtime friend of Federico's since middle school, believes that Federico played a pivotal role in shaping the person he is because of Federico's support during Matias' own experience with bullying:

> Federico stood by me during times of insecurity and self-doubt in both middle school and high school, constantly encouraging me to believe in myself and block out any negative noise. As I was faced with bullying, Federico would remind me of my worth and would help me respond to negative comments with confidence. His belief in me helped me regain my self-esteem, and his wavering support during those formative years has had a lasting impact on my life. I cannot adequately express how meaningful that support was during such a difficult time in my life.

(Exh. 2 M. Gonzalez).

Being the target of relentless bullying because of how he looked was not the only hardship Federico faced growing up. Federico was also diagnosed with severe Attention Deficit Hyperactivity Disorder and an auditory and visual processing delay by the time he was 12 years old. *See* Exhibit 4 (███████████████████ ████████████ to be filed under seal).[6] As a result of his diagnosis of ADHD, ██ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[6] *See also* Exh. 2, letters of Claudine Nannini and Isabella Nannini. Federico continued to receive accommodations (for example, extended time) in college.



███████████████████████████████████████

This was corroborated by Federico's mom, who states in her letter that "[f]rom an early age—even as a toddler—I noticed Federico's impulsivity and disorganization." (Exh. 2 C. Nannini).

Federico's mom noticed that Federico's "impulsivity also affected his decision-making and judgment. At times he would make hasty choices without fully considering the consequences, acting on emotion rather than reason." (Exh. 2 C. Nannini). Federico's mom remembers that it was difficult for Federico to fit in as a child: "He often felt the need to prove himself in social situations, sometimes speaking out of turn, making impulsive remarks, or behaving in ways he thought were funny, even when they weren't. He tried to fit in but sometimes it was difficult and awkward." *Id.* "These challenges significantly impacted his academic and social performance and affected all executive brain functions, particularly in the frontal lobe." *Id.*  Looking back at Federico's conduct in this case, Claudine can see how Federico shared the confidential information with his father and Thermiotis impulsively, immediately after receiving it. *Id.*

At Gulliver, where Federico attended middle and high school, students with learning disabilities were typically separated from their peers and sent to another campus for classes. Due to his ADHD and processing delays, Federico was among those placed in this program. (Exh. 2 A. Antisdel). "While it helped academically,

being separated from mainstream education affected his self-esteem even more." (Exh. 2 C. Nannini). This isolation made it more difficult for Federico to develop his confidence and he grew up longing to fit in.

8. Federico continues his father's commitment to goodwill

Federico, who is 28 years old, also became involved in giving back to the community at a young age. In his sophomore year of high school, Federico began volunteering with Best Buddies, an organization dedicated to fostering inclusion and opportunities for children with learning and developmental disabilities. Twice a week for two years, Federico would stay after school and assist younger children with hands-on activities to help foster a fun and supportive environment.

In partnership with Best Buddies, Federico volunteered on weekends to help host the Special Olympics at the prep school, becoming the chairperson for these events. As stated by Melissa Sullivan, the Principal of Gulliver Prep, "Federico's commitment to service was equally impressive. He played a pivotal role in the success of the Gulliver Prep Special Olympic 5K Run and the Special Olympics Track and Field Games. As Chairperson of these events, he took on various responsibilities enthusiastically and reliably, ensuring their success." (Exh. 2 M. Sullivan). And during college, Federico volunteered for an organization called *2+2=5*, which helps children with disabilities develop cognitive skills.



www.royblack.com | 201 S. Biscayne Boulevard Suite 1300 Miami, FL 33131 | *p* 305.371.6421

Since his arrest in this case, Federico has focused on rebuilding his life and his character. He recognizes that he cannot undo the conduct that brings him before the Court for sentencing, but he believes that he can start to make amends by giving of himself to folks who are desperate and struggling in dire situations. Federico began volunteering every Tuesday night at Choose Love Foundation. (Exh. 2 G. Cordell, Choose Love Foundation letter). Federico spends those nights gathering clothing, essential items and food, and lending a helping hand or friendly ear to the homeless community in Miami. This is the mission of Choose Love Foundation: to provide food and essential items to alleviate the daily struggles of homeless people and listen to their stories to help them in any way we can.[7]

Federico's girlfriend, Carina Yates, describes in her letter how this volunteer work has impacted Federico: "After every session, he tells me stories about the people he's met and the connections he's formed, and it's clear how deeply these experiences have affected him. I believe this has had a profoundly positive impact on him, as he has built friendships with like-minded volunteers who share his commitment to giving back." (Exh. 2 C. Yates).

This is consistent with Federico's nature of looking out for others. Federico's good friend, Julian Cruz, recalls the time when they were out on a group dive and

---

[7] www.chooselovefoundation.com

**BlackSrebnick**
CIVIL | CRIMINAL

Julian was swept away by a rip current, getting lost from the group and almost losing his life. Federico saved him:

> Federico and I are both avid divers, and during a routine outing here in South Florida, I had run out of strength and had fallen victim to a powerful rip current in shallow waters. Of the 3 other divers, only Federico noticed I was missing and convinced the others to commence a search. By that time I had drifted quite far away in a semi-conscious state and would likely have not been found had it not been for his mindfulness, quick thinking, and predisposition to concern for others. I quite literally owe him my life.

(Exh. 2 J. Cruz).

### B. The nature and circumstances of the offense support a downward variance

As they both admitted in their plea agreements, Mauro and Federico are guilty of insider trading while Federico was working at Berkley Research Group (BRG). Mauro profited approximately $145,000 from placing stock trades over a span of two months in 2022 based on non-public information he received from Federico that Federico obtained as a result of his job at BRG. Mauro's actions were limited to trading on the stock for himself.

Mauro made a terrible mistake and committed a crime for which he is exceedingly remorseful and ashamed. There are days when Mauro is emotionally consumed by what he has done as he tries to rebuild his life with the reality that he violated the law, betrayed his family, failed in his role as a father, and destroyed his reputation and legacy in the financial world. Mauro has taken full responsibility for



his actions, is facing sentencing in this criminal case which will brand him a felon for life, has agreed to forfeit approximately $180,000, is facing a possible civil financial penalty in the related SEC case, and a possible restitution order in this case.

Federico was entrusted with confidential information while he was working at BRG, and he revealed that information to two of the most important people in his life—his dad and his best friend (co-defendant Thermiotis). Federico profited zero dollars from this insider information or from his conduct. He did not trade on the stock, did not intend to make any money for himself, and made zero profits from his actions. His base offense level of 8 (0-6 months) is being increased *14 points* to a level 22 (41-51 months) as a result of the almost $2,000,000 investment made by Thermiotis in the stock, which yielded Thermiotis almost $1,000,000 in profits and which Thermiotis did not share with Federico. As Thermiotis told the government during one of his debriefings, Federico did not want anything for providing the insider information to Thermiotis but Thermiotis insisted, so Federico texted a photo of a Rolex watch, which costs approximately $30,000. Federico never got the watch, or anything else from Thermiotis.

That Thermiotis, a 24-year-old friend, would invest almost two million dollars in the stock or gain almost a million dollars from the trades was not something Federico ever imagined. Federico neither directed the trades nor was aware of the magnitude of the investment. But because Federico was the insider, the Guidelines



(2B1.4) propose to hold him responsible for the gain of those he tipped (Mauro and Thermiotis), even if the amount traded and gained by Thermiotis was not anticipated by Federico and even if Federico himself gained zero dollars. For Federico, his proposed guideline range is grossly and arbitrarily exaggerated and is a significant overstatement of his conduct. If the Court views gain, or greed, as a benchmark for determining Federico's sentence, then the value of the $30,000 Rolex would increase Federico's base offense level of 8 by 4 points to a level 12 under U.S.S.G. § 2B1.1(b)(1)(C) (more than $15,000 but less than $40,000), which would yield an advisory guideline range of 10-16 months before taking into account a reduction for acceptance of responsibility.

Unlike many other insider trading cases, this case was not a carefully planned elaborate criminal scheme by Mauro or Federico to engage in an ongoing pattern of capitalizing on inside information. Neither Mauro nor Federico harbored any nefarious or venal motive. Federico received confidential information which he revealed almost immediately to his father and best friend, and neither Federico nor Mauro made any deliberate effort to cause harm to BRG or BRG's client, investors, the market, or the public.

Mauro and Federico recognize that there is an inherent harm caused by insider trading, but ask that the Court also consider, when fashioning a sentence, that the insider trading offense in this case aligns more closely with a regulatory non-violent



offense where Federico gained $0 and Mauro gained approximately $145,000, a modest amount when compared to the heartland of insider trading cases.

At the time of the offense, Federico was 24 years old and BRG was his first full-time job after college. Federico's conduct was not driven by greed or malice but by very poor judgment and by impulsivity, which is consistent with his pre-existing ADHD diagnosis. As the Indictment states, Federico received access to the confidential information on June 7, 2022, and that night or the next day, shared the information with his father. Mauro purchased shares of IEA on June 8, 2022. (ECF#3 at 9, ¶2-3). Thermiotis purchased IEA stock on June 15, 2022 (ECF#3 at 9, ¶8); *see also* Government's Opposition to Nanninis' PSI Objections, ECF#86:4 ("Federico began illegally tipping his father, Mauro Nannini and his friend, co-defendant Alejandro Thermiotis, almost immediately (*see* ¶27, Mauro Nannini began buying IEA on June 9, 2022)"). Federico's actions were also driven by a deep-rooted insecurity stemming from his difficult childhood and a desire to be valued and validated as someone who was finally doing important work. Obviously, Federico's ADHD, impulsivity, and childhood traumas stemming from all the bullying do not excuse his conduct, but these experiences help explain Federico's actions and perhaps answer the question that is likely in the Court's mind as to why Federico committed this offense.

Finally, the circumstances of this case have placed Federico in an untenable position of having to decide whether to seek a lenient sentence from this Court, thereby risking that the SEC will look to impose a penalty against him in excess of $1 million in the civil case. As the Court is aware, the SEC filed a parallel civil action against all the defendants in this criminal case, and both Mauro and Federico agreed to entry of consent judgments in the SEC case as part of their acceptance of responsibility and guilty pleas in this case. *SEC v. Nannini, et. al.*, Case No. 24-cv-23531 (ECF#46). Pursuant to 15 U.S.C. § 78u-1, the SEC proposes that it can seek a monetary penalty against Mauro and Federico in an amount up to three times their respective "gain."

For Mauro, the SEC has indicated that if he is sentenced to less than a year in prison, the SEC will likely seek a civil penalty against him of approximately $360,000, which is twice the amount of the forfeiture to which Mauro agreed in this case.

For Federico, the SEC has indicated that if he is sentenced to less than a year in prison, the SEC is likely to seek a penalty against him of approximately $1.1 million, which is the sum of Thermiotis and Mauro's gain. However, if the Court sentences Federico to more than a year in prison (*i.e.*, a year and a day), the SEC has indicated that it is likely to not seek a monetary penalty against Federico, freeing Federico from the weight that a $1.1 million civil judgment would place on him as



he tries to rebuild his life while suffering all the collateral consequences of a felony conviction. Federico does not have the means to pay the SEC a $1.1 million judgment, so even if Federico paid the SEC $500 a month every month for the rest of his life, Federico still will not have paid off such a judgment at his death, regardless of how long he lives.

### C. The purpose of sentencing

The Sentencing Guidelines direct that each sentence should be determined based on the relevant facts and circumstances, to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

As the Supreme Court has noted, "these four considerations—retribution, deterrence, incapacitation, and rehabilitation—are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes ... to the extent they are applicable' in a given case.'" *Tapia v. United States,* 564 U.S. 319, 324 (2011) (quoting 18 U.S.C. § 3551(a)).

A sentence of home confinement with conditions for Mauro and Federico fits these purposes.

## MAURO NANNINI

### 1. Mauro accepted responsibility for his actions promptly after his arrest

Mauro and Federico were arrested on September 13, 2024. Within a week of their arrest, undersigned counsel initiated discussions with the government about resolving the case. Neither Mauro nor Federico wavered on their decision, made at the outset of the case, to plead guilty and accept responsibility for their actions. Their actions reflect their remorse and the repudiation of their wrongdoing.

Mauro also agreed to forfeit $180,328.41, and he transferred those funds to undersigned counsel's trust account shortly after the change of plea, where the funds remain available for payment to the government upon sentencing.

By agreeing to plead guilty from the start of this prosecution, Mauro expressed a clear and definitive recognition of his responsibility, as opposed to denying or disputing the charges. Mauro also demonstrated that he is prepared to face (rather than avoid) the consequences of his conduct, and has sought ways to make reparation for the harm he has caused. Mauro's early acceptance of responsibility shows accountability and a demonstration of remorse, which is the beginning of the process of making amends for his wrongful actions.

This offense has been a source of agonizing guilt, shame, and distress for Mauro. As Federico's father, Mauro was given the unique responsibility to guide Federico, to teach him by example the values of integrity, honesty, and hard work.



When Mauro had the opportunity to show Federico the importance of integrity in safeguarding the confidential information Federico had, Mauro failed. That failure weighs on Mauro every single day. The Court probably hears many people say they wish they could go back in time and make a different decision—for this father, the anguish of not having made a different decision with his son and not being able to change the past is gut-wrenching.

    2. <u>Mauro's conduct was an isolated event that does not reflect the core of his character</u>

The conduct that brings Mauro before the Court is an isolated and short-lived divergence from Mauro's law-abiding life, dedicated to service and positive impact in his community and at home. Mauro has been a respected businessman, an active member of the community, a valued volunteer with various charities, and a dedicated son, husband, father, and friend to many. Mauro's wrongdoing was an out-of-character, isolated mistake that did not involve significant planning over a prolonged period of time. He was not involved in widespread manipulation of the market, making his conduct distinguishable from more egregious cases of insider trading.

Throughout his life Mauro always sought to be a positive influence and set an example for his children, including Federico. Mauro's decisions in this case show that his judgment was obviously clouded and wrong, but he was not acting out of malice or a desire to cause anyone harm. As Mauro's wife writes in her letter, this



offense was completely uncharacteristic when viewed in the context of Mauro's entire life:

> When the FBI came to our house on the morning of September 13 and said Mauro was being arrested for insider trading, my initial reaction was not one of worry but of relief because, in my mind, I thought, *this must be a misunderstanding*. Knowing Mauro, I believed this would be resolved quickly because he has always been a law-abiding citizen who holds himself to the highest standards. Instead, this situation has spiraled into something deeply painful. . .

> The impact of this case has been devastating—not just for Mauro, but for our entire family, especially our son Federico. I have watched them both carry an unbearable weight of guilt, shame, and remorse. Mauro has been completely distraught . . . , asking me for forgiveness over and over again, accepting full responsibility for what he did and struggling to reconcile how he, a man who has lived his entire life as an example of integrity, lost his way, committed this offense, and now finds himself in this position of appearing before you to be sentenced for his actions.

(Exh. 1, C. Nannini).

The letters submitted for Mauro show that Mauro's wrongdoing stands in stark contrast to the man he has been throughout his life. "This is not the Mauro we know—he has always been a man of integrity, a pillar of strength for his family and community. What occurred was entirely out of character and a terrible mistake, one that does not define the person he truly is." (Exh. 1 J. Roney).

Gustavo Machado, who has known Mauro for over 50 years, writes about the difficulty in putting into words just how kind Mauro has been his entire life: "We all know how difficult it is to express all the kindness of a good friend and person in two pages, sometimes like somebody said 'sobran las palabras'. . . .  While Mauro

acknowledges his error, I humbly plead not to let one mistake define him and outweigh his years of dedication and unwavering commitment to his family and community." (Exh. 1 G. Machado).

Oscar Sabater, who has known Mauro since they were only 6 years old, talks about Mauro's lifelong commitment to generosity: "Throughout the years, I have seen Mauro consistently demonstrate his generosity and attentiveness to the needs of his family and close friends. He has always been present, offering his time and support without hesitation." (Exh. 1 O. Sabater). "They [Mauro and his father] are, and always have been, the epitome of integrity. Knowing Mauro as I do, I have no doubt that this situation is not a reflection of his true character or his lifelong commitment to doing what is right." *Id.*

Alfredo Cohen, who has known Mauro for the last 45 years, sees him as a man of immense good: "Mauro's actions over decades speak far louder than a single error, and I hope you can see him as I do: a person of immense goodness, deserving of understanding and mercy." (Exh. 1 A. Cohen)

These letters show that for decades, Mauro has prioritized generosity and service to others, and that his commitment to philanthropy is not performative—it is woven into the person he is. From his early days in Venezuela, fundraising and donating essentials to the less fortunate, to his continued efforts in the U.S., his actions reflect a deep-seated dedication to service. Whether through his longstanding



support of Fundacion Techo, his involvement with the Florida Breast Cancer Foundation, or his direct efforts feeding and providing for the poor through the Orden de Malta, Mauro's generosity has touched thousands of lives across nations. His wrongdoing in this case is an aberration, and not a reflection of who he truly is. "Mauro's actions over decades speak far louder than a single error[.]" (Exh. 1 A. Cohen).

3. Mauro's cancer diagnosis and no risk of recidivism support a sentence of home confinement

Mauro's cancer diagnosis is a very serious health condition that has been under strict treatment and surveillance by Mauro's doctors. As described earlier, prostate cancer can be treated successfully as long as it is contained to the prostate. The recurrence of cancer in the prostate while Mauro is in custody would quickly deteriorate into a life-ending event with any delay in treatment by BOP, which would allow the cancer to spread. Medical testing and treatment within the BOP is inadequate and often long delayed, causing "federal prisoners [to] die from treatable conditions that are not diagnosed or treated in a timely way within the prison system." *Lawmakers Push for Federal Prison Oversight After Reports of Inadequate Medical Care*, www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical- ("'I'm deeply alarmed by reports that the Bureau of Prisons has demonstrated foot dragging when it comes to providing medical care to those in its custody,' said Grassley, also a member of the

Judiciary Committee. 'BOP needs to be held responsible for this failure and take action to raise its standards'").

An analysis conducted by NPR revealed that "more people in BOP custody died of cancer than any other cause from 2009 to 2020."[8] In 2022, District Judge Dalton of the Middle District of Florida held BOP officials in contempt for allowing an inmate to waste away and die from what was otherwise a treatable cancer (and then lying about it). *See United States v. Bardell*, 6:11-CR-401, ECF#140 (M.D. FL. October 4, 2022) (contempt order, finding that "with timely diagnosis and treatment, Mr. Bardell's attesting physician assessed his chances of survival at 71%" but instead BOP ignored Bardell's medical needs and let him die).[9]

The medical situation within BOP is likely to deteriorate, "as Elon Musk and the Department of Government Efficiency (DOGE) continue slashing through federal agencies [and] the Bureau of Prisons remains in the cross hairs . . . Last week, pressure by DOGE to increase efficiency and reduce economic burden led to the BOP under the Trump administration's direction to eliminate or cut in half retention bonuses for prison workers, [which Union officials say] are crucial in solving prison

---

[8] www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates.

[9] *See also* https://reason.com/2022/10/10/judge-holds-federal-bureau-of-prisons-in-contempt-for-allowing-man-to-waste-away-from-untreated-cancer/



staffing issues, both correctional and medical." *FCI Elkton and Other Federal Prisons Feeling Impact of DOGE,* www.morningjournalnews.com/news/local-news/2025/03/fci-elkton-and-other-federal-prisons-feeling-impact-of-doge/.

Thus, while incarceration is punitive for all defendants, it would be particularly punitive for Mauro if he does not receive the medical surveillance and various procedures he currently undergoes every three months to stay ahead of the cancer. These are relevant factors that the Court considers when determining what is a reasonable sentence for Mauro. *See* 18 U.S.C. § 3553(a)(2)(D) (requiring consideration of "providing . . . needed . . . medical care . . . in the most effective manner" when imposing a sentence); U.S.S.G. § 5H1.1 (policy statement on departure for age); *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (the "mandate" to consider a defendant's history and characteristics "includes consideration of a defendant's age and medical condition"); *see also* U.S.S.G. § 1B1.13 (allowing for a reduction in sentence when the defendant is suffering from metastatic cancer, or serious medical conditions that require specialized medical care without which the defendant "is at risk of serious deterioration in health or death").

Additionally, Mauro is 63 years old, has no criminal history, and poses no risk of recidivism. The Sentencing Commission states that "'age is generally a strong factor influencing the likelihood of committing a crime,' with 'older offenders . . . substantially less likely than younger offenders to recidivate following release.'"

*United States v. Friedlander*, 2021 WL 2661109, at *3 (M.D. Fla. June 29, 2021). Statistically, Mauro is unlikely to recidivate: The Sentencing Commission has found that recidivism rates decline as age increases.[10]

In *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007), the district court found that the defendant was not likely to re-offend and sentenced him to 60 months even though his guideline was 188-235 months. The Eleventh Circuit affirmed the variance, holding that a sentencing court is "require[d] . . . to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *Id*. at 745. Because the defendant had "fundamentally changed since his offense" and "pose[d] a lesser risk to the community," the court was correct in granting a variance. *Id*. at 746; *see also United States v. Cherry*, 487 F.3d 366, 369-70 (6th Cir. 2007) (granting 43% downward variance where the defendant presented a low risk of reoffending); *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (affirming large downward variance where there was no risk of recidivism); *United v. Nellum*, 2005 WL 300073 * 3 (N.D. Ind. Feb. 3, 2005) (granting downward variance by relying in part on the Sentencing Commission's study on aging inmates showing that '[r]ecidivism rates decline consistently as age increases . . . [U]nder §

---

[10] U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* at p. 12, 28 (May 2004), https://tinyurl.com/3udwt6mr.



3553(a)(2)(C), age of the offender is plainly relevant to the issue of 'protect[ing] the public from further crimes of the defendant'"); *United States v. Hernandez*, 03-CR-1257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (varying downward because "defendants ... over the age of forty ... exhibit markedly lower rates of recidivism in comparison to younger defendants"); *United States v. Hodges*, 07-CR-706, 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting the "inverse relationship between age and recidivism" and "tak[ing] into account the defendant's age in fashioning his sentence").

## FEDERICO NANNINI

1. <u>Federico accepted responsibility for his actions promptly</u>

Like Mauro, Federico also accepted responsibility for his wrongdoing from the start of this prosecution and agreed to entry of consent judgments in the SEC case, accepting responsibility for his actions and resolving that matter as well. Federico is a young man who made a grave mistake, but he was not driven by malicious intent or greed. Instead, Federico acted out of immaturity and impulsivity which is a hallmark symptom of ADHD, as well as the need for validation arising from years of childhood insecurity and emotional hardship. Although his challenges growing up do not excuse his actions, they do shed light on Federico's conduct. Growing up feeling different and teased and ridiculed created insecurities and a need for validation. Unlike the heartland of insider trading cases where insiders like

Federico act out of greed, Federico acted out of an emotional need to gain approval, feel important and worthy, and to help his closest friends and family. The bullying and social isolation growing up created a deep-seated desire to be valued and accepted, leading him to make the bad decisions he made here.

Federico did not financially profit from his actions and making money for himself was not Federico's goal. This makes Federico's conduct less culpable than the vast majority of insider trading cases. As Thermiotis told the government during debriefings, Federico did not ask for anything in return, and the subject of receiving a watch came up only after Thermiotis insisted. Federico's involvement in this offense was the result of very bad and misguided judgment rather than malice or greed, and he has expressed sincere remorse for his actions.

Federico did not fully appreciate the professional fallout from his actions, or that his breach of confidence of his employer BRG would have such significant consequences. Federico certainly did not harbor any intent or motivation to harm BRG, and considered his supervisor at BRG a valued mentor and someone he respected and admired. Federico was immensely thankful for this job and the opportunity that BRG gave him, and had no malicious intent to damage BRG or violate the trust that BRG placed in him for his own greed.

During the hearing to place co-defendant Tonarely on pretrial diversion, the government commented to the Court that Federico lied to BRG about the FINRA



letter and that Thermiotis and Federico "deleted text messages and came up with false narratives justifying their trading." ECF#79:11. Federico does not deny this. But he wants the Court to know that he was acting out of fear and panic, feeling overwhelmed by the seriousness of what he had done. This was the first time that Federico was involved in any criminal activity, and he was under extreme fear of the consequences. In fact, as part of discovery in this case, the government produced a Reddit page where, in August 2022 after the offense conduct, Federico had searched whether someone can go to jail for insider trading even if they lost money (like Mauro). Federico's lies when presented with the FINRA letter, and his actions with Thermiotis and the texts, were not intended to make his offense worse. As a young man realizing the gravity of his wrongdoing, Federico's actions were a misguided emotional panic-driven reaction that he acknowledges was wrong. From the moment he was arrested, Federico was remorseful and ready to plead guilty and admit his wrongful conduct.

    As described earlier, the letters submitted on Federico's behalf show that he is a benevolent young man whose actions in this case are entirely inconsistent with his good character. He has devoted time and personal involvement in community and charitable causes, starting since he was in high school by helping children with learning and other disabilities, able to contribute meaningfully based on his own experiences. Federico has worked hard his whole life and has demonstrated

perseverance to overcome difficult personal and academic challenges. Federico's dedication to his studies, working to gain admission to universities like Bentley, St. Gallen, and Georgetown, are inconsistent with someone who seeks shortcuts or dishonest gains. Federico's longtime friend Brandon describes how, as a teenager, Federico avoided trouble and encouraged his friends to make ethical decisions, once advising against sneaking out at night by saying, "This isn't worth losing trust over." (Exh. 2 B. Dierickx).  Perhaps those words of wisdom to his friend, spoken years ago, are the true measure of this young man.

    2. <u>The advisory guideline range does not compute a fair penalty for Federico</u>

    The sentence the Court imposes on Federico must balance all of the factors and goals of § 3553(a), and must be "sufficient, but not greater than necessary," to achieve those goals. As courts and commentators have recognized, the outsized weight given to the loss / gain calculation under the 2B1.1 Fraud Table prevents guidelines sentences—and in particular Federico's advisory guideline—from fulfilling this goal. *See, e.g., United States v. Corsey,* 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) ("[T]he loss guideline is fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges").

    Under § 2B1.4, Federico is held responsible for "the total increase in value realized through trading in securities by the defendant *and persons . . . to whom the*

*defendant provided inside information.*" Because of this, Federico's base offense level of 8 (0-6 months) is increased *14 points* to a level 22 (41-51 months) solely as a result of the magnitude of Thermiotis' $2M investment in the stock and $933K resulting gain. These are amounts that Federico never imagined and trading activity that Federico did not direct. Indeed, the amount of Thermiotis' investment (and ultimate gain) was so monumental that, as noted in the PSI Report, "TD Ameritrade rejected [Thermiotis' initial] trade because it was 'a large order relative to the average volume of this stock.'" ECF#71:10.

For Federico, then, his advisory guideline sentence is increased eightfold solely as a result of Thermiotis' gains, which Federico he did not control or receive. Federico admits that he wrongfully shared the confidential information with Thermiotis, but Federico did not orchestrate or influence the trading or the scale of Thermiotis' investment. For this reason, the Court should reject the advisory guideline proposed in the PSI report, as it does not result in punishment that reflects, as it should, an "individual assessment" of Federico, his personal culpability, and the factors that mitigate his critical mistakes.

The unfairness and disparate impact of using the § 2B1.1 Fraud Table and Thermiotis' gain as a measure of Federico's criminality is best analyzed by Judge Rakoff in *United States v. Gupta,* where Judge Rakoff sentenced Gupta to 2 years in prison in an insider trading case where the gain was calculated at almost $5 million

under the § 2B1.1 Fraud Table. This amount was determined in large part by the guidelines "assign[ing] [Gupta] no fewer than 18 points for the resultant but unpredictable monetary gains made by the others, from which Mr. Gupta did not in any direct sense receive one penny." 904 F. Supp. 2d 349, 349 (S.D.N.Y. 2012). Judge Rakoff described how the securities fraud guidelines deviate from the goals of sentencing by relying on "the huge increases" in the 2B1.1 Fraud Table, which are arbitrary and draconian: "The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data." *Id*. at 351. In Gupta's case (like in Federico's case), the guideline range purporting to reflect "the proper measure of Mr. Gupta's crime and punishment" was driven almost entirely by the monetary gain of Gupta's codefendant, "in which Mr. Gupta did not share in any direct sense." *Id.* This was contrary to the goals of sentencing:

> [T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*Id.* at 351. Similarly for Federico, the almost $1M gain by Thermiotis is the single biggest driver of Federico's advisory sentence, resulting in a guideline that is

divorced from the objectives of Section 3553(a) and from common sense, and that does not reflect a reasonable sentence. *See Kimbrough v. United States,* 552 U.S. 85, 108-110 (2007) (affirming downward variance where the guidelines fail to achieve § 3553(a)'s purposes).

Similarly, in a sentencing for insider trading with gains of $7 million following the defendant's conviction at trial in the Southern District of New York, Judge Kaplan declined to impose a guideline sentence under the loss table because there was "no evidence that [the defendant] knew or had any control over the size of the trading or the potential gains that he was enabling people to make." *United States v. Blaszczak et. al*, 17-CR-357 (S.D.N.Y.) ECF#412:69-70. Judge Kaplan found that the loss table and guideline calculation were arbitrary and overrepresented the gravity of the offense:

> The second thing that's obvious from the long discussion we had earlier in the morning is that a very substantial driver of the adjusted offense level, and therefore of the advisory guideline ranges, is the gain amount. The trading gains. The reliance on loss amounts and gain amounts in determining sentencing guidelines rests on a generalization.
>
> The bigger the gain or the bigger the loss, the more serious is the crime. And for a rough rule of thumb, it's not a bad starting point. Reasonable. But it certainly isn't reasonable in some cases…[W]e have this table of amounts in the sentencing guideline and it is in some respects extremely arbitrary. . . [T]he logic of the table, in my personal humble opinion, is flawed. . .
>
> So while I've computed the guidelines according to the table, because I am required to do it, it's my opinion that the guideline ranges derived from that table overstate the gravity of these crimes . . .



> Furthermore, I'm troubled by the application of the loss and gain table, particularly to Mr. Worrall. He knew that the information he passed was going to go to people who were going to trade on the information. But I see no evidence that he knew or had any control over the size of the trading or the potential gains that he was enabling people to make. So I have a lot of trouble, more in his case than the others, holding him responsible for 100 percent of the $7 million in trading profits, even if otherwise that would have been appropriate. So that mitigates what I'm prepared to impose on Mr. Worrall. Both of those things.

*Id.* at 67-70. Judge Kaplan sentenced Worrall to 20 months in custody, where the gain was $7 million. *Id.* at 72.

### 5. Federico has suffered a devastating price for his wrongdoing

"Today, the collateral consequences of a felony conviction form a new civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 182 (E.D.N.Y. 2016). Federico has paid a devastating price for his wrongdoing, and life since his arrest has been punishing. Federico lost his dream job and the mentor he admired at BRG. His actions have cost him his reputation, he has lost his friendships, and he has tarnished his family's name.

After overcoming so much and devoting so many difficult years to his education, at 26 years old, Federico's life has now been catastrophically changed. He has derailed his career. He will likely not practice the profession he worked so hard to attain. He has no job and no income. He will be a convicted felon, with no prospect of being employed in finance, the career of his dreams. He has had to suffer great humiliation, once again. No one who looks at Federico's actions and the

consequences that have befallen him would be tempted to engage in insider trading, thinking that the consequences are minimal.

Clarisa Osio describes Federico's suffering: "Judge Ruiz, the weight of what has already happened is not lost on Federico. The consequences he's faced go far beyond the courtroom. His name has been aggressively published in the media, turning what should have been a private lesson into an overwhelmingly public punishment. His reputation has been tarnished in a way that may never fully be repaired." (Exh. 2 C. Osio). Federico's sister describes how Federico has shattered his chances of pursuing the career of his dreams, and how "this mistake has undone everything he worked so hard for." (Exh. 2 I. Nannini). And as Federico's girlfriend describes "Federico has also lost the ability to work in the field he loves. While he fully acknowledges that this is a consequence of his own choices, it has been devastating for him. His career was something he was passionate about, and having that taken away has only deepened his remorse." (Exh. 2 C. Yates).

Clarisa echoes those same thoughts:

> The reality is that, regardless of what happens next, Federico has already lost a great deal. His dream of a corporate career is now almost impossible. For someone who has worked tirelessly to get to where he was, that alone is a devastating consequence. He has also lost friendships, realizing that some people he considered close have distanced themselves in the wake of these events. Fede made a mistake—one that he fully acknowledges. And the consequences he has already endured are severe. He has lost his career prospects, his reputation, and what he thought were lifelong friendships.



(Exh 2 C. Osio). This conviction will haunt Federico for the rest of his life. This "experience has change him" and "it is a mistake he will never repeat." (Exh. 2 C. Yates).

### D. The need to avoid unwarranted sentencing disparities supports a downward variance for Mauro and Federico

Recognizing that the insider trading guideline does not reflect the goals of sentencing under § 3553(a), courts often vary downward substantially in insider trading cases, including those with greater gains or aggravating factors that do not exist here. For example:

1. <u>Insider trading cases where courts have imposed non-custodial sentences</u>

We ask the Court to join with other districts that have imposed non-custodial sentences for insider trading, recognizing that such sentences are sufficient under § 3553(a) to serve the goals of punishment. For example:

- In *United States v. Levoff,* 19-CR-780 (D.N.J.), Levoff was an attorney who served as Apple's global head of corporate law and corporate secretary who was sentenced to probation after trading on Apple securities based on inside earnings information. Levoff was on a committee of senior executives who reviewed Apple's quarterly earnings report prior to public dissemination. ECF#16 (Indictment). Using this confidential information, Levoff traded Apple securities ahead of earnings announcements in 2015 and 2016 and made approximately $382,000. *Id,* Exacerbating Levoff's conduct was the fact that he was responsible for securities laws compliance at Apple, including compliance with insider trading laws. Levoff pled guilty and was sentenced to four years of probation and 2,000 hours of community service. ECF#38 (Judgment).

- In *United States v. Schulman,* 16-CR-442 (E.D.N.Y.), the defendant was a partner at a national law firm. Schulman was accused of informing his

investment adviser that his client, King Pharmaceuticals, planned to merge with Pfizer. ECF#1 (Indictment). The tip resulted in $319,000 in illicit profits, including $15,500 in profits for Schulman. *Id.* at 6. Schulman went to trial and was convicted of conspiracy and securities fraud. Schulman's offense level was 22 (41-51 months) and the government sought a sentence of 51 to 64 months. ECF145:5, 14 (government Sentencing Memorandum). The court sentenced Schulman to three years of probation and 2,000 hours of community service. ECF#153 (Judgment).

- In 2011-2012, there was a trio of insider trading cases in New Jersey where the defendants' offense levels ranged from 19-23 but they all received noncustodial sentences:

  • A defendant with an offense level of 19 was sentenced to one year probation and a $5,000 fine. *United States v. Robarge*, No. 11-cr- 00802 (D.N.J. June 4, 2012) (ECF#9).

  • A defendant with an offense level of 20 was sentenced to 3 years of probation and a $260,000 fine. *United States v. Holley*, No. 11-cr-00066 (D.N.J. Dec. 17, 2012) (ECF#139).

  • A defendant with an offense level of 23 was sentenced to two years of probation and a $15,000 fine. *United States v. Vollmar*, No. 11-cr-00739 (D.N.J. May 14, 2012) (ECF#9).

- In *United States v. Catenacci*, 21-CR-759 (N.D.Ill.), the defendant was an oncologist who consulted on a cancer drug trial and learned of good results before the results were made public. Defendant purchased the stock and sold when the positive information was publicized, gaining $134,142. Defendant's guideline range was 15-21 months. ECF#34 (government's sentencing memo). The government sought a 12-month sentence. The court imposed a sentence of time served (one day) and one year of supervised release. ECF#38 (Judgment).

- In *United States v. Talbot*, No. 10-30036 (D. Mass.), a tipper pleaded guilty to insider trading. He had an offense level of 19, and the prosecutor sought a within range sentence of 37 months. However, the Judge sentenced the defendant to three years of probation that included 10 months of home confinement with electric monitoring. ECF#76.



- In *United States v. Lewis, et. al*, 1:23-CR-00370 (S.D.N.Y.) the defendant pled guilty to one count of insider trading and his gain was $302,064.73. The court sentenced him to 3 years' probation, with the first 4 months on home incarceration. ECF#100; 101.

- In *United States v. Scalia*, No. 3:11-cr-00522 (S.D. Cal.), co-defendants pleaded guilty to insider trading in a scheme that gained over $600,000. They were sentenced to three years of probation and ordered to pay $185,420 in restitution. ECF#60, 62.

- In *United States v. Markin, et. al,,* 1:22-CR-00395 (S.D.N.Y.) the defendant pled guilty to one count of insider trading, with a gain of $403,375.75. The court sentenced him to 3 years' probation, with 6 months on home confinement, and ordered him to forfeit the $403,375.75 gain. ECF#72.

- In *United States v. Brown, et. al.*, 2:17-CR-01423 (D. Ariz.) defendants Brown and Fox pled guilty to one count of insider trading, with a total gain of $368,423.73. Brown was sentenced to 3 years' probation with 8 months on home confinement; Fox was sentenced to 3 years' probation. ECF#64; 65.

- In *United States v. Collins*, 18-CR-567 (S.D.N.Y.), the defendant obtained insider information that a clinical trial involving a drug for multiple sclerosis had gone poorly. The defendant sold the company's shares before the information became public and passed on the information to his father in law. The loss avoided was $570,900. The guideline range was 37-46 months, but the court sentenced the defendant to six months of home confinement, five years of probation, and 500 hours community service. ECF#173 (Judgment).

- In *United States v. Anderson*, 06-CR-91 (N.D. Ga.), the defendant was a bank vice president who learned that the bank was to be acquired by a larger bank. Defendant traded on the bank's stock (gaining $130,000) and tipped a friend (who gained $40,000). ECF#1 (Indictment). Defendant fully litigated the case pretrial and did not plead guilty until the morning of the start of trial. The government sought a sentence of 18 months (guideline range was 18-24 months). The court sentenced him to six months home confinement and two years of probation. ECF#71 (Judgment).

- In *United States v. Binette*, 3:10-CR-30036 (D. Mass.), the defendant was convicted of insider trading and his gain was $615,000. The defendants

Guideline range was 41 to 51 months, but he was sentenced to 48 months' probation, with 6 months in a half-way house and 6 months of home confinement. ECF#223.

- In *United States v. Bonthu*, 1:18-CR-00237 (N.D. Ga.), the defendant was a manager at Equifax. He took advantage of insider information to obtain a profit of more than $75,000 dealing in Equifax stock. He was sentenced to 8 months of home confinement and a fine of $50,000, in addition to forfeiture of his profit. ECF#20.

   2. <u>Insider trading cases where courts have granted a significant downward variance</u>

Courts have also substantially varied downward in insider trading cases,

including cases with aggravating factors. For example:

- In *United States v. Khan*, 17-CR-00295 (N.D. Cal.), the defendant was convicted of participating in an insider trading conspiracy and related scheme. ECF#157:1. Khan bribed an employee at Ross Stores to obtain private information that Khan used to trade on Ross options. *Id.* at 1-3. Using accounts in the names of family members to avoid detection, Khan profited $8.2 million. *Id.* at 2, 4. Khan's offense level was 25 (63-78 months). The Court sentenced him to 30 months of imprisonment. *Id.* at 9; ECF#171 at 2.

- In *United States v. Blackstad*, 19-CR-486 (S.D.N.Y.), the defendant was the owner and principal of an investment fund. He was convicted for trading on material nonpublic information obtained from his co-conspirator, a CPA at a publicly traded company. ECF#167:1-4. Blackstad made efforts to conceal the scheme, arranged for his employees to make some of the trades to avoid detection, and funneled the proceeds through an account held by a separate company. ECF#167:3-5. Blackstad gained over $6 million. *Id.* at 4. Due to multiple enhancements, his offense level was 33 (135-168 months). The Court sentenced him to 36 months. *Id.* at 9; ECF#172.

- In *United States v. John Afriyie*, 16-CR-00377 (S.D.N.Y.), the defendant was convicted of securities fraud for using nonpublic material information obtained as part of his employment as an analyst at a private investment fund. ECF#140:1. The defendant made the purchases through a broker account held in his mother's name and pretended to be his mother in calls with his broker.

*Id.* at 1, 2, 6. Afriyie's offense level was 28 (78-97 months). *Id.* at 1. The Court imposed a sentence of 45 months. ECF#151:72.

- In *United States v. Michael and Gerald Shvartsman,* 23-CR-307 (S.D.N.Y.), two brothers pled guilty to securities fraud. After learning that a company was interested in acquiring Trump Media, Michael arranged for one of his employees to be named to the board of directors of the acquiring company. *Id.* at 1-2. Through this employee, Michael received insider information, which Michael and Gerald used to make trades and they also tipped their business partners, employees, and friends. ECF#219:3; ECF#221:3. Michael made $18 million; Gerald almost $5 million. ECF#221:4; ECF#:219 at 1. Despite a guidelines range of 46 to 57 months for Michael, the Court imposed a sentence of 28 months. ECF#221:4. And despite a guidelines range of 37 to 46 months for Gerald, he was sentenced to 22 months. ECF#219:4.

- In *United States v. Klein*, 2:16-CR-00442 (E.D.N.Y.), the defendant was an investment advisor who was tipped off about a pending merger and conducted illegal trades based on that information. The transactions he and another co-conspirator made resulted in more than $400,000 in gains. Klein was sentenced to 6 months in prison. ECF#178.

- In *United States v. Johnson,* 16-CR-457 (E.D.N.Y), the defendant was convicted of wire fraud. The defendant was the former head of HSBC's Global Foreign Exchange cash trading, and exploited confidential information about a client's planned transaction to generate $3.1 million in profits for HSBC and, by extension, enrich himself. ECF#217:3-6. Johnson's total offense level was 29 (87-108 months). The court imposed a sentence of 24 months.

- In *United States v. Barama,* 19-CR-00463 (N.D. Cal.), the defendant was convicted of securities fraud. ECF#260:3. He was an IT professional who obtained access to his former employer's quarterly financial performance before that information was made public. *Id.* at 2-3. Using that misappropriated information, the defendant traded ahead of four different earnings announcements, making over $6 million in profits. *Id.* Barama's offense level was 25 (57-71 months), *id.* at 3, but he received a sentence of 18 months' imprisonment. ECF#267:19.



- In *United States v. Rajat Gupta*, 1:11-CR-00907 (S.D.N.Y.), the defendant, who served on the board of directors of Goldman Sachs and Procter & Gamble, was convicted of securities fraud for disclosing material, non-public information. At sentencing, although the government alleged that the defendant had realized a total gain of $15,355,409, the court found that the defendant's total gain was $5,032,195. The defendant's guideline range was 78 to 97 months, but the court sentenced him to 24 months imprisonment. ECF#127.

- In *United States v. Scott London*, 2:13-CR-00379 (C.D. Cal.), the defendant was a senior partner at KPMG and pled guilty to one count of insider trading. The defendant's gain was over $1 million and his total offense level 23 (46 to 57 months). *Id.* ECF#47:5-6. The court sentenced him to 14 months imprisonment. *Id.* ECF#66.

### E. The potential financial penalties that Mauro and Federico face

In addition to the sentences this Court imposes, Mauro and Federico also face the potential for substantial financial penalties.

Mauro agreed to forfeit $180,328.41, which he transferred to undersigned counsel's trust account shortly after the change of plea so the funds would be immediately available for payment to the government.

As discussed earlier, if Mauro is sentenced to less than one year in prison, the SEC has indicated it is likely to seek a civil penalty against him of approximately $360,000. As to Federico, although his gain was $0, the SEC is likely to seek a civil penalty against him of $1.1 million if he is sentenced to less than one year in prison. Thus, although both Mauro and Federico seek a non-custodial sentence from this Court, they are exposed to a potentially huge liability to the SEC. To put it in perspective, in a case where the total gain by Mauro and Federico was at most

$180,000, the United States government (DOJ and SEC) proposes to extract from them $1,640,000. The Nanninis, as well as Thermiotis and Tonarely, have jointly moved Judge Bloon, before whom the SEC case is pending, to transfer the SEC case to this Court for final determination. That motion is pending.

Finally, Federico's employer, BRG, is seeking restitution of legal fees BRG incurred in support of this prosecution, and BRG has reserved the right to seek restitution from Federico alone. The parties are in discussions in an effort to reach a resolution on restitution before sentencing.

Thus, in addition to all the punishment already suffered by Federico and to be suffered by him when sentenced by the Court, Federico also would be financially crushed for the rest of his life if all these financial penalties are imposed on him.

It bears repeating that no one who sees Federico teetering on the edge of this abyss would consider it a good idea to engage in insider trading like he did. The Court does not need to send him or Mauro to prison to deter others or show that engaging in insider trading has severe and lifelong consequences. A non-custodial sentence with conditions that include substantial community service will hold them both accountable for their actions, while also taking into consideration that their overall conduct reveals their crimes to have been aberrations to their true character.



### III. CONCLUSION

Mauro and Federico Nannini know and accept that their wrongdoing placed them in the situation they are in today. They admit that the decisions they made were wrong and fully accept their responsibility for their conduct. They are both ashamed and humiliated, and ask that the Court recognize that their transgressions do not outweigh all the positive aspects of their lives. Mauro and Federico have started on the path to redemption and ask for the Court's compassion to help them make that journey.

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131

*/s/ Howard Srebnick*
**HOWARD SREBNICK**
Florida Bar No. 919063
HSrebnick@RoyBlack.com

*/s/ Jackie Perczek*
**JACKIE PERCZEK**
Florida Bar No. 042201
JPerczek@RoyBlack.com

*/s/ Jeanelle Gomez*
**JEANELLE GOMEZ**
Florida Bar No. 1026021
JGomez@RoyBlack.com

